IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

GERALD DESMOND GRIFFIN,        §
                               §
            Petitioner,        §
                               §
v.                             §        No. 4:17-CV-243-Y
                               §
LORIE DAVIS, Director,         §
Texas Department of Criminal   §
Justice, Correctional          §
Institutions Division,         §
                               §
            Respondent.        §


## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254 filed by Petitioner, Gerald Desmond
Griffin, a state prisoner, against Lorie Davis, director of the
Texas Department of Criminal Justice, Correctional Institutions
Division, Respondent. After having considered the pleadings and
relief sought by Petitioner, the Court has concluded that the
petition should be denied.

## I.  FACTUAL AND PROCEDURAL HISTORY

On May 7, 2014, in Criminal District Court Number Four,
Tarrant County, Texas, Case No. 1360873D, a jury found Petitioner
guilty on one count of engaging in organized criminal activity and
one count of aggravated robbery with a deadly weapon and assessed
his punishment at 75 years' confinement on each count. (SHR[1] 73,

_____

[1]"SHR" refers to the state court record of Petitioner's state habeas
application in WR-86,281-01.

78, doc. 19-21.) Petitioner appealed his conviction, but the Second District Court of Appeals of Texas affirmed the trial court's judgment. (Id. at 108.) Petitioner also filed a state post-conviction application for a writ of habeas corpus challenging his convictions, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court. (SHR 2-19 & Action Taken, docs. 19-21 & 9-19.)

The appellate court set out the factual background of the case as follows:

> On the evening of October 6, 2012, Marcus Brooks drove Naomi Cilumba to her friend's apartment after having dinner together. They were sitting in Brooks's car talking when they noticed someone circling the car trying to see in. The person then opened the driver's side door and held a gun to Brooks's head. The person wore a dark-colored bandana around his face and an orange hoodie. Brooks saw another person standing behind the car also wearing an orange hoodie. He also noticed an "older-model vehicle" behind him.

> The man with the gun tried to open the back door of the car, at which point Brooks was able to grab the gun from him. Brooks testified that he grabbed for the gun because "that was [his] . . . only time to make [his] move, to make it through the night." Both attackers ran off, and Brooks shot at one of them "four to five times." Brooks and Cilumba drove away, and Brooks called the police.

> Fort Worth police arrived at the apartment complex where the shooting had occurred and found Keandrick Reed lying in the parking lot. Reed had been shot, and people were tending to his wounds. Police found a bloody bandana "that had been tied to be fashioned around your face," bullet casings, and a cell phone. Police later found a hoodie that matched the description that witnesses had given of the suspects. Both the bandana and hoodie were bloody and had bullet holes.

Reed confessed to the attempted robbery and named Demarrio Handy as the person who had the gun that night. He also stated that [Petitioner] had picked them up and had taken them to the location of the incident. Reed testified that they had planned to commit robbery and split the money among the three of them.

Reed testified that he, Handy, and [Petitioner] were members of a street gang called the Untamed Gorillas or 7 Tre. [Petitioner] was an "OG," short for "Original Gangster," a high-ranking member of the gang. Reed said that as a lower-ranking member of the gang, he would have to follow orders that an OG gave.

(Mem. Op. 1-3, doc. 19-3.

## II. ISSUES

Petitioner raises seven grounds for relief, complaining of ineffective assistance of counsel (grounds one through five); denial of his right to confront and cross-examine witnesses (ground six); and insufficiency of the evidence (ground seven). (Pet. 6-7 & Insert, doc. 1; Traverse 1-8.)

## III. RULE 5 STATEMENT

Respondent does not move for dismissal of the petition for failure to exhaust state-court remedies and does not believe that the petition is barred by the statute of limitations or subject to the successive-petition bar. (Resp't's Answer 5, doc. 20.)

## IV. STANDARD OF REVIEW

A § 2254 habeas petition is governed by the heightened standard of review provided for by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). See 28 U.S.C. § 2254. Under the Act, a

writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100-01 (2011). This standard is difficult to meet but "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. Further, when the Texas Court of Criminal Appeals denies relief in a state habeas-corpus application without written order, it is "presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter,* 562 U.S. at 99. In such a situation, a federal court may assume the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was

applied. *Townsend v. Sain,* 372 U.S. 293, 314 (1963)[2]; *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001); *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir. 1997). A petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); *Williams v. Taylor,* 529 U.S. 362, 399 (2000).

The state habeas judge, who also presided at Petitioner's trial, entered findings of fact and conclusions of law relevant to Petitioner's claims and the Texas Court of Criminal Appeals adopted those findings in denying relief. Petitioner fails to rebut the presumptive correctness of the state courts' factual findings with clear and convincing evidence; thus, the Court applies the presumption of correctness to those findings, including the court's credibility findings, in considering Petitioner's claims. *See Richards v. Quarterman,* 566 F.3d 553, 563-64 (5th Cir. 2009); *Galvan v. Cockrell,* 293 F.3d 760, 764 (5th Cir. 2002).

## V.  DISCUSSION

### A. Ineffective Assistance of Counsel

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI,

---

[2]The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d). *Harris v. Oliver*, 645 F.2d 327, 330 n.2 (5th Cir. 1981).

XIV; *Evitts v. Lucey,* 469 U.S. 387, 396 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697.

In applying this test, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. Where a petitioner's ineffective-assistance claims have been reviewed on their merits and denied by the state courts, federal habeas relief will be granted only if the state courts' decision was contrary to or involved an unreasonable application of the *Strickland* standard in light of the state-court record. *Richter,* 562 U.S. at 100-01 (quoting *Williams v. Taylor,* 529 U.S. 362, 410 (2000)); *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Thus, a federal court's review of state-court decisions regarding ineffective assistance of counsel must be "doubly deferential" so as to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow,* 134 S. Ct. 10, 13 (2013) (quoting *Cullen v.*

6

*Pinholster,* 563 U.S. 170, 190 (2011)).

Petitioner claims his trial counsel, Daniel Young, was ineffective by (1) opening the door to multiple extraneous robberies; (2) failing to move for a directed verdict on the grounds that the state failed to prove the 7 Tre gang was a criminal street gang that continuously or regularly committed criminal activities; (3) failing to object to the statutory definition of "criminal street gang" as unconstitutionally vague; (4) waiving "objection to the twitter photograph which was obtained without a warrant and was based on hearsay"; and (5) failing to move for a directed verdict on the grounds that the state failed to prove that a robbery or an attempted robbery was the motivation of his co-defendants. (Pet. 6-7 & Insert, doc. 1; Traverse 1-8, doc. 24.)

Counsel filed an affidavit in the state habeas proceedings, in which he responded to the allegations as follows (all spelling, grammatical, and/or punctuation errors are in the original):

### OVERVIEW

I was appointed to represent [Petitioner] on or about December 12, 2012 on what turned out to be a number of different cases. Ultimately, [Petitioner] was indicted for four aggravated robberies (each enhanced to habitual punishment) and charged with one misdemeanor assault. The four robbery cases each alleged two counts: [Petitioner] Engaged in Organized Crime (by committing aggravated robbery) and [Petitioner] committed aggravated robbery. The four filed robbery cases against [Petitioner] spanned a several day period, from October 3 through October 6, 2012. Three of the robberies were alleged to have been committed on October 3, 2012 in Arlington; the fourth

robbery, and the robbery that is the subject of this writ, was alleged to have been committed on October 6, 2012 in Fort Worth.

Two accomplices were also indicted for the same four robberies for which [Petitioner] was indicted: Demarrio Handy and Keandrick Reed. Handy was also charged with the same misdemeanor assault that [Petitioner] was charged with. In none of the robberies for which [Petitioner] was indicted was he identified by any victims or neutral witnesses, nor was there any direct forensic evidence (fingerprints, DNA, video, etc.) implicating [Petitioner]. The State's overall theory was that [Petitioner] was an original gangster who recruited or encouraged or required Handy and Reed, as newer gang members, to commit robberies and split the proceeds with him. Per the State' theory, [Petitioner] would sometimes select the robbery victim, he would scope out locations, he would drive Handy and Reed to the robbery locations, and he would pick them up afterwards. Thus, the State's theory of criminal liability was based on [Petitioner]'s being a party to the robberies. Handy and Reed were also charged with additional robberies occurring in Arlington and Fort Worth. In some, but not all of these additional robberies, [Petitioner] was implicated, but not indicted.

The robbery conviction that is the subject of this writ, Cause No. 1360873, was the last robbery that [Petitioner] and his two accomplices committed together on October 6, 2012. Reed was shot multiple times during this robbery, survived his wounds, and testified against [Petitioner] at trial. Essentially, the State's evidence against [Petitioner] was the testimony of Reed and Reed's cell phone records showing communications between Reed's phone and [Petitioner]'s phone on the date and at the time in question. Reed's cell phone was found in the parking lot at the scene of the robbery where Reed was laying after being shot several times by the intended victim after the victim wrestled the gun away from Handy. As he was recovering in the hospital, Reed informed the police about the prior robberies that he and Handy and [Petitioner] had committed. He also told the police about aggravated robberies that he and others had committed not involving [Petitioner] per se. One of the prior aggravated robberies that Reed informed the police about for which [Petitioner] was not indicted was another robbery involving [Petitioner] acting as a party that occurred in Fort Worth approximately thirty minutes

before the robbery currently under review. Per Reed, [Petitioner] was the driver and Reed and Handy were the actual robbers in the earlier robbery.

The robbery case that is the subject of this writ was not the first robbery case that went to trial involving [Petitioner] and his two accomplices. In the first case that went to trial, [Petitioner] was tried for Engaging in Organized Crime and Aggravated Robbery on or about February 6, 2014 in Cause No. 1304800. The alleged victim was Sean Crosby. In that case, Mr. Reed testified as to how [Petitioner] dropped him and Handy off to commit an aggravated robbery on October 3, 2012 at or near an apartment complex in Arlington and picked the two up after the robbery. As in the case at hand, Reed testified against [Petitioner] and the State introduced Reed's cell phone records showing communications between Reed's and [Petitioner]'s cell phones.

In the Crosby robbery case (# 1304800), Reed was impeached at trial with his prior gang-like affiliations, trophy pictures, and hope for leniency for his multiple pending robberies, including the one in which he was later shot. The victim, Mr. Crosby, was indefinite about the time the robbery occurred and the time that the police were called. He had been robbed in his apartment's parking lot while sitting in his car talking on his phone, and he fled after the robbery to a nearby Kroger store where he had to wait for an employee to finish using the store phone before he could call the police. Per Crosby, the times of the robbery varied from as early as 8:00 or 8:30 p.m. to as late as 9:00 p.m., and Mr. Crosby's phone, stolen in the robbery and never recovered, could not be used to pin down the time of the robbery. One of the officers who responded to Crosby's call testified that he was dispatched to the Kroger from where Crosby called the police at 10:04 p.m. The officer who conducted the examination of Reed's cell phone testified that there were several calls between Reed's and [Petitioner]'s phones between 8:12 and 10:59 p.m. on October 3, 2012: an incoming call from [Petitioner] to Reed at 8:12; a missed call from [Petitioner] at 9:58; and outgoing calls from Reed to [Petitioner] at 8:30, 9:25, and 10:59. In addition, there were numerous calls between Reed's phone and unidentified persons between approximately 7:00 p.m. and 11:00 p.m. on October 3, 21012; in total, there were about seventy calls to and from Reed's phone for October 3, and about one-half were

to and from unidentified persons–just call numbers were available.

The Crosby jury hung at nine for guilty and three for not guilty, and the Court declared a mistrial. As the jury notes in the case reveal, the jury was concerned over time discrepancies, who called whom and when, and, in counsel's opinion, the relevancy of the phone communications between [Petitioner]'s and Reed's phones in the context of the times involved in the robbery. Counsel argued the ambiguity in the evidence, and there was evidently enough ambiguity or uncertainty to convince three jurors that the State had not proved its case.

By contrast to the first case tried, case 1360873, the subject case for this writ, had little ambiguity. The robbery occurred at about 1:00 a.m. on October 6. Reed testified at trial to being shot by the intended victim (later identified as Marcus Brooks) during the course of the robbery and being left bleeding in the parking lot after his accomplice, Handy, fled the scene on foot. Per Reed, [Petitioner] had picked him and Handy up before the robbery and drove them to commit a robbery for money. Handy had the only gun between the two (Handy and Reed), the same gun that Brooks used to shoot Reed after Brooks took the gun away from Handy. At the time, Handy and Reed were members of the Untamed Gorillas (also know as the 7 Trey), and [Petitioner] was an original member of the gang. The three were to split the proceeds of their robbery. Reed had [Petitioner]'s cell number saved in his phone; he and Handy were to call [Petitioner] if they could not find him. [Petitioner] was supposed to pick them up after the robbery.

One of the first responding officers on the scene of the shooting was Officer Jones. He arrived at the scene of the foiled robbery at about 1:00 a.m. to find Reed wounded in the parking lot. Immediately before going to the scene of the shooting, he had been at the apartment complex next door investigating a report of men with guns.

Brooks, the intended victim, testified that he had been on a date and was returning his date home. He pulled into the parking lot about 1:00 a.m. and was talking to his date before she went to her apartment. While he was parked and talking to his date, Brooks was robbed by two men. He described the robbery attempt, described how he

took the gun away from the man pointing it at him as the robber tried to unlock the back door of the car, described how the man from whom he took the gun ran on foot, described how the other robber came around to the driver's side of the car with his hands in his pockets, and described how he shot the second man multiple times. Brooks and his date fled the scene in his car. Brooks called the police to report the shooting and later gave them the gun that he had wrestled from one of the robbers and that was still in his possession.

Reed's cell phone records in this case formed a much tighter pattern than the records in the first case tried. Here, there were about seven calls between Reed's and [Petitioner]'s phones spanning a period of about forty minutes: an outgoing call to [Petitioner] at 11:52 p.m. on October 5, a missed incoming call from [Petitioner] at 12:22 a.m. on October 6, an outgoing call to [Petitioner] at 12:22 a.m., an outgoing call to [Petitioner] at 12:24 a.m., and three incoming calls from [Petitioner] at 12:27 a.m., 12:30 a.m. (lasting four minutes), and 12:36 a.m. Unlike the first case tried, there were no more outgoing calls of any kind from Reed's phone after the last incoming call from [Petitioner]'s phone at 12:36 a.m. on October 6. Presumably, Reed was shot after that call and no more calls were placed from his phone. There was a later incoming call from Reed's mother.

## PREPARATION

From the first of my representation, [Petitioner] was an uncooperative client. Over the course of various meetings, he maintained that he did not know who his two co-defendants were, and he had no idea how he came to be associated with the robberies he was accused of committing. He did not want to discuss the cases because he had nothing to discuss. On an August 9, 2013 court date, [Petitioner] allowed as to how it would do no good for him to talk to my investigator because he ([Petitioner]) had nothing to say. [Petitioner] did, however, complain to the Court that his bonds had not been reduced; the Court advised that if the bonds changed they may well increase.

[Petitioner] maintained that he was taking care of his sick mother in Baton Rogue, La. during the time of the robberies. [Petitioner] was not interested in the dates of the alleged robberies and was unfamiliar with

the nickname Double G and did not [know] who that person could be, despite numerous references in the record that Double G was his nickname, that he had been documented as an Arlington Untamed Gorilla gang member with that nickname, that he was listed as a contact in Reed's cell phone with that nickname as an alias for Gerald Griffin, and that he had a "Double" tattooed on one forearm and a "G" tattooed on the other. [Petitioner] had no idea how or why his cell phone number would be in Reed's call logs and surmised that anyone could be using his phone. Later, he had no idea why or how his twitter page on the internet would show postings from the metroplex area during the time of the robberies because the twitter location identifier was turned on. Again, anybody could have made the twitter postings using his phone. The only plea deal [Petitioner] was interested in was one that would get him out of jail with credit for time served.

Other than his mother, [Petitioner] never gave the defense any specific names or contact information of people that could definitively testify he was in Baton Rogue at the time of his alleged offenses. His mother was not sure of the exact date he arrived in town (he was arrested in Baton rouge in mid-November 2012 by the Marshall's service based on an Arlington robbery warrant) because she was sick at the time. Per his mother, a barber named Chill could vouch for the dates of [Petitioner]'s presence in Baton Rouge, but she never supplied a number or address for Chill, and the defense could not locate a person by that name as a barber in Baton Rogue. [Petitioner]'s sister informed the defense that she thought she took [Petitioner] to Baton Rogue in late September of 2012, but she could provide no gas receipts or documentation for such.

[Petitioner] did at one time late in the case tell my investigator he knew Keandrick Reed from some marijuana transactions, but that he never supplied transportation for Reed or Handy. [Petitioner] also informed my investigator of a job he held through a temporary staffing agency and how his payroll records would provide an alibi for the robberies. The records provided no such alibi.

Counsel reviewed hundreds of pages of reports for the various cases pending against [Petitioner] as well as reports that implicated him in other possible offenses. All witness statements were reviewed, including written

and oral statements. The statements of the two
accomplices (Handy and Reed) were reviewed multiple
times. Crime scene evidence was reviewed, and counsel and
his investigator reviewed the scene of the shooting and
surrounding area. Counsel spent considerable time
reviewing phone logs for Mr. Reed's phone, and contacted
several potential expert witnesses in case the State
decided to introduce cell tower location information for
either [Petitioner]'s or Reed's phones. Counsel reviewed
[Petitioner]'s Twitter account that was accessible
on-line by anyone searching [Petitioner]'s user name on
Twitter. Indeed, the information is still available
on-line. Per the Twitter account, tweets from the
metroplex area were made on [Petitioner]'s account during
the time of the robberies, and there were no tweets from
out-of-state until late October 2012. Counsel reviewed
witness lists supplied by the State and checked the names
against the more that 300 pages of reports provided.
Counsel also reviewed considerable punishment evidence
(about 250 pages) including: records of prior
convictions, jail records (disciplinary hearings, etc.),
prior offense reports, etc. All photos and videos were
reviewed, and the various offenses were charted out as to
time, location, report numbers, alleged victims, etc. My
investigator interviewed [Petitioner] and talked to his
mother and sister in an effort to make sure we were not
missing alibi evidence. In short, we looked at everything
the State provided and everything that we could obtain.
All in all, defense counsel ended up reviewing about 22
CDs of material, some of which were redundant and had
been provided in other formats. Finally in preparation
for the trial currently under review, counsel reviewed
the testimony from the earlier trial.

## RESPONSE TO GROUND ONE

[Petitioner] alleges that counsel was ineffective in
opening the door to extraneous robberies and that counsel
was further ineffective in not objecting to the admission
of the extraneous evidence as being more prejudicial than
probative.

As noted in the **OVERVIEW** section above, both trials
(the Oct. 3, 2012 robbery and the Oct. 6, 2012 robbery
under review here) involved Reed's testimony as an
accomplice witness and Reed's cell phone records linking
[Petitioner] to the robberies. In both trials, Reed and
his testimony were impeached. For the earlier robbery, as

previously noted, Reed's cell phone records used to link [Petitioner] as an accomplice did not form a tight pattern; the actual time of the robbery was not pinned down with specificity; and there were numerous phone calls to and from Reed's phone throughout the period in which the robbery could have occurred–many to and from unknown persons.

For the October 6 robbery trial under review, counsel was not only saddled with Reed's testimony, but also with a much tighter pattern of phone calls between Reed's and [Petitioner]'s phones: seven calls starting at 11:52 p.m. on October 5 and ending at 12:36 a.m. on October 6. Six of the calls were made over a fourteen-minute period from 12:22 a.m. to 12:36a.m. with one of the calls lasting four minutes and with there being no more outgoing calls from Reed's phone after the last call at 12:36 a.m. The robbery was pegged at the time of Reed's being shot, occurring at approximately 1:00 a.m. on October 6. Although not introduced at trail, Fort Worth PD phone logs show that after being dispatched to the scene of the shooting, Officer Jones arrived on scene at about 1:02 a.m.

Counsel was also saddled with the implication that Reed and company could have been involved in another robbery before the robbery in which he was shot. Officer Jones was allowed to testify, over counsel's objection, that prior to being dispatched to the scene of the shooting he was at the apartment complex next door investigating a call regarding two men with guns, and that later, after arriving at the scene of the shooting he advised that there was a Domino Pizza delivery man at the hospital who had been the victim of a recent robbery. Believing that the man could be associated with the shooting involving Reed, Jones dispatched two officers to talk to the delivery driver at the hospital. At punishment, Reed testified that he, Handy, and [Petitioner] were involved in robbing the delivery driver about 30 minutes prior to the robbery in which Reed was shot ([Petitioner]'s complicity appears to be providing transportation to and from the robbery locations).

Detective Koralewski testified after Officer Jones, after Reed, after the cell phone examiner, and after the victim Brooks. The Court found that counsel's cross examination of Det. Koralewski regarding what he did not do during his investigation of the case opened the door

to the State's presenting extraneous evidence. The cross was designed to cast doubt regarding the completeness of Koralewski's investigation. Accomplice witness Reed had already been impeached to the degree possible after testifying about the events leading to his being shot, and Reed's phone records that had already been introduced knit a tight pattern of complicity. Further, there was before the jury an implication that the co-defendants had been involved in an earlier robbery. Counsel decided to try to tarnish the strength of the State's case by showing that Koralewski made no effort to interrogate [Petitioner], to try and find [Petitioner]'s phone, to try and obtain phone records for [Petitioner]'s phone, or to try and search Handy's phone (the other co-defendant charged in the offense) who had already admitted his involvement and consented to a search of his phone during the investigation, but had not implicated [Petitioner]. Handy had been interviewed by Koralewski and an Arlington detective concerning the instant offense and offenses in Arlington. Counsel's plan in crossing Koralewski was to limit the cross as to what he did not do in this case. Counsel did also cross the detective about not obtaining a warrant for [Petitioner]. Counsel simply lost track of the fact the instant case was a direct filing by the D.A.'s Office. In short, counsel felt it was imperative to do what was possible to diminish the strength of the State's case, even at the risk posed in crossing Koralewski.

With the exception of crossing the detective on not obtaining a warrant, counsel does not concede that he opened the door to the extraneous offenses, but the Court obviously decided differently. However, during a hearing outside the presence of the jury, the Court did express a concern about how far the State could go regarding the extraneous material and indicated that the State would not be allowed to go into the details of extraneous offenses. The Court implicitly made a decision as to what limits it would place on the State; thus, counsel does not believe an objection would have changed the Court's decision. As the State proceeded to re-direct Koralewski, counsel believes the State did overstep the Court's limits and did leave a false impression with the jury, but counsel did not object because he did not want to emphasize the re-direct and did not want to risk opening the door any further.

I do not believe that the extraneous conduct

admitted in this case was responsible for a different verdict than the mistrial obtained in the first trial. In the instant case, it was Reed's second time to testify, and he already had a good idea of how counsel would proceed to impeach him. Moreover, I think that the fact that Reed was testifying about the robbery in which he was actually shot gave him a certain air of credibility with the jury. Finally, there was a tight pattern of phone communication between Reed's and [Petitioner]'s phones and an implication that the co-defendants may have been involved in another robbery shortly before this one. Finally, in the first case tried (Cause 1304800), the Court did find that I had opened the door to the instant offense, the one in which Reed was shot, when I crossed Reed as to the number of robberies he was charged with and his motivation for testifying against [Petitioner]. I do not believe that this case would necessarily have ended in a mistrial (only three for not guilty in the first trial) but for the admission of the extraneous conduct. I certainly do not think the trial would have ended in a not guilty.

### RESPONSE TO GROUND TWO

[Petitioner] alleges that counsel was ineffective for not seeking a directed verdict on the Engaging in Organized Crime Count because there was no evidence that his gang continuously or regularly associated in the commission of criminal activities.

There was enough evidence to get the issue to the jury. Detective Millikin testified that he had previously served as a gang Detective in Arlington for six years. He was familiar with the street gangs of the city and he was familiar with the definition of a criminal street gang. The Untamed Gorillas (UTG) was a criminal gang in Arlington existing of about sixty-seven members and was involved in criminal activities. The gang started in 2005 with three members as a rap group. As the gang evolved and recruited new members, it became involved in more and more violent crimes. Millikin described how the UTG picked up the name 7 Tre (both names used for the same group), and he described their various hand signs they used for identification. The gang has referred to itself as goons or Goon Squad, and Arlington is known as Goon City.

[Petitioner] was documented as an UTG in March 2008.

State's Exhibit 7 shows [Petitioner] throwing up a hand
sign designating UTG; there is another person flashing a
hand sign for 7 Trey. [Petitioner], in State's Exhibits
15-16, has "UNTAMED GORLLIA" tattooed across his back.
Reed is a documented member of UTG, 7 Tre, and the
Bloods. Handy is a documented member of the TYN, the 7
Trey or UTG, and the Bloods. Millikin testified as to how
[Petitioner] would be considered an original gangster or
original member of the 7 Trey, and newer members would be
expected to listen to him. Finally, Millikin testified as
to how gangs used guns for the commission of crimes,
robberies, and to gain the respect of other gangs.

At trial Reed testified that he has known
[Petitioner] for about two years and that he (Reed)
joined the UTG (7 Trey) several months before the offense
leading to his arrest. Handy and [Petitioner] were
already members of the gang. [Petitioner]'s orders would
have to be followed because he was an original member.
Reed testified in detail about how [Petitioner] picked
him and Handy up to commit a robbery and how he and Handy
wore bandanas to cover their faces. Reed identified
State's Exhibits 8 and 9 as pictures of Handy and him
wearing bandanas as they did on the night of the robbery;
they are also holding guns. The photographs were taken
before the robbery on October 6, 2012 but after Reed was
jumped into the gang. Also on direct, Reed testified that
he thinks he took the picture of Handy, Exhibit 39,
before the robbery of October 6, 2012. The picture shows
Handy flashing a 7 Trey sign with money and two guns in
front of him. The automatic pistol in the photo appears
to be the same pistol the police recovered involved in
Reed's shooting on October 6, 2012 as depicted in State's
Exhibit 6.

On cross, Reed admitted that Defense Exhibit's 1-6
were photographs that he took or had taken during the
summer of 2012 when he went to visit relatives in
Louisiana. He confessed to being a member or a
neighborhood gang in his hometown in Louisiana, but
attempted to downplay the significance of his hometown
gang membership and Defense Exhibit 1-6. The exhibits are
trophy pictures showing Reed with money and a gun, and
wearing a bandana and flashing a hand sign, and wearing
red clothing. Although Reed denied they were evidence of
gang activity, the pictures were before the jury.

In short, there was evidence to support submitting

the Engaging in Organized Crime count to the jury.

## RESPONSE TO GROUND THREE

[Petitioner] alleges that counsel was ineffective in not challenging the constitutionality of the definition of a criminal street gang as used in the Organized Crime statute. [Petitioner] argues that the definition of a criminal street gang is unconstitutionally vague.

Counsel disagrees. Counsel was not aware of any Texas case holding the statute unconstitutionally vague at the time of trial, and a recent challenge to the statute on the ground of being unconstitutionally vague has been denied. Moreover, counsel fails to see how the statute is unconstitutionally vague as applied to [Petitioner]. After all, he had sat through a previous trial with the same charge-just a different time, victim, and set of phone records.

## RESPONSE TO GROUND FOUR

[Petitioner] raises a multifarious complaint that appears to be based on his allegations that counsel was ineffective in not objecting to the State's use of his Twitter account because the State's access to the Twitter account was not obtained by a warrant and violated his constitutional rights against illegal search, because the color of a photo on his Twitter page had been altered (presumably by the State) to tie him the UTG gang, and because the only independent evidence apart from Reed tying [Petitioner] to his alleged phone number was the information contained on [Petitioner]'s Twitter page.

Counsel would have gladly tried to rebut the information that [Petitioner] complains of if he could have; however, counsel was not going to call [Petitioner] to the stand to complain about the supposed color change of a photo or to deny that the number Reed had for him in Reed's cell phone was not [Petitioner]'s number.

There was a great deal of other information in addition to the photo, regardless of whether it had been changed, to show that [Petitioner] was a member of the UTG: there was Reed's testimony; there was the testimony of former gang Detective Millikin that [Petitioner] was a long term, documented member of the gang; and there were the big, block letter of "UNTAMED GORILLA" tattooed

across [Petitioner]'s back. Further, it was fairly
irrelevant to whom the number "belonged"; Reed testified
that the number was the number used to call [Petitioner],
and the contact name in Reed's cell phone directory for
the number was 'Griffin, Gerald a/k/a Double G.'"

The Twitter account, to counsel's knowledge, was not
accessed illegally by the State. Counsel, in preparation
for trial, with nothing but [Petitioner]'s Twitter user
name, accessed the same account (or profile) complete
with the photo complained of and numerous tweets on the
internet. Indeed, counsel cannot be sure he had to use
[Petitioner]'s user name on Twitter to access the page;
he may have found it with a more general search on
Twitter. At least one of the tweets on [Petitioner]'s
Twitter page refers to the number found for [Petitioner]
on Reed's phone. The page was on Twitter for anyone to
find, and still is if one searches with [Petitioner]'s
user name.

### RESPONSE TO GROUND FIVE

[Petitioner] alleges that counsel was ineffective
because he did not move for a directed verdict based on
there being no independent evidence apart from Reed's
testimony that [Petitioner] was part of a theft or
attempted theft; thus, there was no basis for the
Organized Crime or Aggravated Robbery convictions.

Reed testified that [Petitioner] picked him and
Handy up to go commit a robbery for money, and Brooks
described in a fair amount of detail events that could
fairly, easily, and almost only be interpreted as a
robbery attempt. Brooks thought that the two wanted
something of value, presumably money. There was more than
enough evidence of a theft or attempted theft to get the
robbery issue to the jury.

(SHR 33-44, doc. 19-21 (record references and citations omitted).)

Based on the documentary record, counsel's affidavit, and his

own recollection of the trial-court proceedings, the state habeas

judge found counsel's testimony and affidavit credible and

supported by the record and entered factual findings, too numerous

19

to list here, refuting Petitioner's claims. (SHR 58-64, doc. 19-21.) Based on those findings, and applying the *Strickland* standard and relevant state law, the state court entered the following legal conclusions:

7. Counsel's cross-examination of Detective Koralewski was the result of reasonable trial strategy.

8. Counsel's decision to not move for a directed verdict on the grounds that the State failed to prove that 7tre grana was a criminal street gang who continuously or regularly committed criminal activities was the result of reasonable trial strategy.

9. Counsel's decision to not object to the statutory definition of "criminal street gang" was the result of reasonable trial strategy.

10. Counsel's decision to not object to the Twitter photograph was the result of reasonable trial strategy.

11. Counsel's decision to not move for a directed verdict on the grounds there was no independent corroboration of the element of theft or attempted theft was the result of reasonable trial strategy.

12. Petitioner has failed to prove that counsel's representation fell below an objective standard of reasonableness.

13. A party fails to carry his burden to prove ineffective assistance of counsel where the probability of a different result absent the alleged deficient conduct sufficient to undermine confidence in the outcome is not established.

14. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffective claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of

sufficient prejudice, which we expect will often be so, that course should be followed."

15. [Petitioner] has failed to show that there is a reasonable probability that the outcome of the proceeding would have been different had counsel cross examined Detective Koralewski differently.

16. [Petitioner] has failed to show that there is a reasonable probability that the outcome of the proceeding would have been different had counsel moved for a directed verdict.

17. [Petitioner] has failed to show that there is a reasonable probability that the outcome of the proceeding would have been different had counsel objected more.

18. [Petitioner] has failed to show that there is a reasonable probability that, but for the alleged acts of misconduct, the result of the proceeding would be different.

19. [Petitioner] has failed to prove that he received ineffective assistance of trial counsel.

(Id. at 65-66 (citations omitted).)

Applying the appropriate deference to the state courts' factual findings, and having independently reviewed Petitioner's claims in conjunction with the state-court records, the state courts' application of *Strickland* was not objectively unreasonable. Petitioner's claims are largely conclusory, with no factual or legal basis, involve strategic and tactical decisions made by counsel, or would have required counsel to make frivolous or futile motions or objections, all of which generally do not entitle a state petitioner to federal habeas relief. *See Strickland,* 460 U.S. at 689 (providing strategic decisions by counsel are "virtually

unchallengeable" and generally do not provide a basis for post-conviction relief on the grounds of ineffective assistance of counsel); *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (concluding that counsel is not required to make futile motions or frivolous objections); *Green v. Johnson,* 160 F.3d 1029, 1037, 1042 (5th Cir. 1998) (providing "[m]ere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue" and "counsel is not required to file frivolous motions or make frivolous objections").

Petitioner has not demonstrated deficient performance or shown any reasonable probability that the outcome of his trial would have been different but for counsel's acts or omissions. A petitioner shoulders a heavy burden to overcome a presumption that his counsel's conduct is strategically motivated, and to refute the premise that "an attorney's actions are strongly presumed to have fallen within the wide range of reasonable professional assistance." *Messer v. Kemp,* 760 F.2d 1080, 1090 (11th Cir. 1985). Petitioner has presented no evidentiary, factual, or legal basis in this federal habeas action that could lead the Court to conclude that the state courts unreasonably applied the standards set forth in *Strickland* based on the evidence presented in state court. See 28 U.S.C. § 2254(d). Petitioner is not entitled to relief under grounds one through five.

**B. Procedural Default of Grounds Six and Seven**

Under his sixth ground, Petitioner claims he was denied his right to confront and cross-examine the unknown law-enforcement agent who accessed his Twitter account and downloaded the photograph of Petitioner, admitted as state's exhibit 12, containing references to gang membership for use by the state. (Reporter's R., vol. 5, 10-12, doc. 19-8; Reporter's R., vol. 7, doc. 19-10.) Under his seventh ground, Petitioner claims that the evidence was insufficient to persuade a properly-instructed and reasonable jury, beyond a reasonable doubt, that he was a party to the offenses or that he committed the offenses to establish, maintain, or participate as a member of a criminal street gang. (Pet. Insert, doc. 1; Traverse 9, doc. 24.) Respondent asserts that these grounds are unexhausted and procedurally barred from the Court's review. (Resp't's Answer 33-36, doc. 20.)

State prisoners seeking federal habeas-corpus relief under § 2254 are required to exhaust all claims in state court before requesting federal collateral relief. 28 U.S.C. § 2254(b)(1); *Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999). The exhaustion requirement is satisfied when the factual and legal substance of the federal habeas claim(s) have been fairly presented to the highest court of the state, in this case the Texas Court of Criminal Appeals, in a procedurally proper manner, in a petition for discretionary review or a post-conviction state application for

writ of habeas corpus. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-48 (1999); *Fisher*, 169 F.3d at 302; *Carter v. Estelle*, 677 F.2d 427, 443 (5th Cir. 1982).

Petitioner did not file a petition for discretionary review, thus, for purposes of exhaustion, he was required to raise the claims in his state habeas application. He concedes, however, that he independently raises the claims for the first time in this federal petition. (Pet. 8, doc. 1.) Therefore, the claims are unexhausted for purposes of § 2254(b)(1).

"A procedural default . . . occurs when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Nobles v. Johnson,* 127 F.3d 409, 420 (5th Cir. 1997) (citing *Coleman v. Thompson,* 501 U.S. 722, 735 n.1 (1991)). If Petitioner presented his unexhausted claims at this time to the Texas Court of Criminal Appeals in another state habeas application, the court would find the claims to be procedurally barred under the Texas abuse-of-the-writ doctrine. TEX. CODE CRIM. PROC. ANN. art. 11.07 § 4(1)-(2) (West 2015); *Ex parte Whiteside,* 12 S.W.3d 819, 821 (Tex. Crim. App. 2000). This doctrine is an adequate and independent state ground for the purpose of imposing a procedural bar. *See Hughes v. Quarterman,* 530 F.3d 336, 342 (5th Cir. 2008).

A state petitioner may overcome a procedural default in state court by showing either (1) cause for the default and actual prejudice, or (2) that the federal court's failure to consider the claim will result in a miscarriage of justice, *i.e.,* that the petitioner is actually innocent of the crime(s) for which he was convicted. *Sawyer v. Whitley,* 505 U.S. 333, 339-40 (1992); *Coleman,* 501 U.S. at 750; *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

The reasons given by Petitioner for his failure to exhaust the claims in state court are that he was ignorant of "the law and procedures" and was under the impression that his appellate counsel would file a timely petition for discretionary review. (Pet. 8, doc. 1; Pet'r's Traverse 17, doc. 24.) However, neither excuse constitutes good cause for his failure to exhaust the claims in state court. Ignorance of the law and filing procedures are common problems for inmates seeking post-conviction relief. And, Petitioner's "impression," alone, that appellate counsel would file a petition for discretionary review on his behalf is overly broad because virtually every habeas petitioner could argue that he *thought* his counsel would exhaust an unexhausted claim. Nor has Petitioner produced new, reliable evidence not presented at trial so as to satisfy the "actual innocence" exception. Therefore, absent a showing of cause and prejudice or a miscarriage of justice, such showing not having been demonstrated by Petitioner, his claims under grounds six and seven are procedurally barred from

this Court's review.

## VI.  Conclusion

For the reasons discussed, the Court DENIES Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. All pending motions not previously ruled on, including Petitioner's "Motion for Evidentiary Hearing," "Motion for Stay of Proceeding to File Amendment and Supplement Pursuant 2254 to Add Additional Facts to Ground (1)," and "Motion to Amend and Supplement to Add Additional Facts" are DENIED. (Mots., docs. 25-27.)

Further, Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability is issued under 28 U.S.C. § 2253. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003). "Under this standard, when a district court denies habeas relief by rejecting constitutional claims on their merits, 'the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *McGowen v. Thaler,* 675 F.3d 482, 498 (5th Cir. 2012) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)). When a district court denies habeas relief by rejecting constitutional claims on procedural grounds without reaching the merits, the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the

denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (quoting *Slack,* 529 U.S. at 484). Petitioner has not made a showing that reasonable jurists would question this Court's resolution of his constitutional claims under grounds one through five or its procedural ruling as to grounds six and seven. Therefore, a certificate of appealability should not issue.

      SIGNED April <u>25</u>, 2018.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE